1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

TOBY MEAGHER, et al.,

CASE NO. C19-0259JLR

11

Plaintiffs,

ORDER ON CROSS-MOTIONS
FOR PARTIAL SUMMARY
JUDGMENT

v.

12

13

KING COUNTY, et al.,

14

Defendants.

15

16

## I.    INTRODUCTION

17

Before the court is (1) Plaintiff Toby Meagher's motion for partial summary

18

judgment (Pl. MPSJ (Dkt. # 62)) and (2) Defendant King County, Rodney Prioleau,

19

Ronne Lee Kintner, J. Garcia, Gregg Curtis, and Michael Kilbourne's (collectively,

20

"Defendants") motion for partial summary judgment (Def. MPSJ (Dkt. # 64)).  Both

21

motions are opposed.  (*See* Resp. to Pl. MPSJ (Dkt. # 78); Resp. to Def. MPSJ (Dkt.

22

# 76).  The court has considered the motions, the relevant portions of the record, and the

1  applicable law. Being fully advised,[1] the court GRANTS Mr. Meagher's motion and

2  GRANTS in part and DENIES in part Defendants' motion.

3  ## II.    BACKGROUND

4       This case involves an altercation that occurred between two inmates in King

5  County Jail on July 15, 2018, that left Mr. Meagher severely injured and lying in a pool

6  of his own blood. (*See* SAC (Dkt. # 18) ¶¶ 1.1-1.3.) Mr. Meagher brings claims against

7  King County and several King County officials under 42 U.S.C. § 1983, for breach of

8  contract, and for negligence. (*See id.* ¶¶ 5.1-7.3.) The gravamen of Mr. Meagher's

9  allegations is that Defendants failed to protect Mr. Meagher from inmate Troy Leae's

10  attack by failing to consider the threat Mr. Leae posed to other inmates, for placing Mr.

11  Leae in a cell with Mr. Meagher, and for failing to pay heed to Mr. Meagher's complaints

12  about Mr. Leae. (*See id.* ¶ 1.1.)

13  **A.    King County Jail's Classification Process**

14       King County Jail maintains an inmate classification system that it developed with

15  the assistance of the National Institute of Corrections ("NIC"). (1st Zeldenrust Decl.

16  (Dkt. # 65) ¶ 7, Ex. 6.) When an inmate is booked into King County Jail, he or she is

17  initially screened by a Jail Health Services ("JHS") nurse, who determines whether the

18  //

19  //

20  //

21

22       [1] Neither party requests oral argument (*see* Pl. MPSJ at 1; Def. MPSJ at 1), and the court finds oral argument unnecessary to its disposition of the motions, *see* Local Rules LCR 7(b)(4).

1   inmate is placed in psychiatric or non-psychiatric housing.  (*See id.* ¶ 31, Ex. 30 ("Curtis

2   30(b)(6) Dep.") at 46:8-11, 74:8-18.)[2]

3        Within the umbrella of psychiatric housing, there are three sub-categories:  (1)

4   Red, for inmates expressing an immediate potential for self-harm or suicide; (2) Yellow,

5   for inmates with active symptoms and severe functional impairment; and (3) Green (for

6   inmates with a major mental illness and moderate functional impairment).  (*See id*. ¶ 8,

7   Ex. 7.)  The JHS nurse will place the "psych" or "non-psych" recommendation on a

8   document known as a 571 form and provides it to a Classification Program Specialist

9   ("CPS") employed by the Department of Adult and Juvenile Detention ("DAJD").  (*See*

10  Curtis 30(b)(6) Dep. at 82:1-18.)  If JHS medical staff writes "okay to GP" on a Form

11  571 or 572, the inmate is cleared from psychiatric or medical housing, and it is then up to

12  DAJD's classification department ("Classification") to determine the inmate's security

13  level.  (*Id.* at 82:1-21.)

14       CPS's are responsible for making initial inmate classifications, managing the

15  housing units, responding to inmate requests ("kites"), and conducting disciplinary

16  hearings.  (*Id.* ¶ 7, Ex. 6 at 5.)[3]  CPS's apply King County Jail's classification scoring

17  grid that ultimately determines an inmate's security level and housing placement within

18  the King County Jail.  (*Id.* at 9-10; Curtis 30(b)(6) Dep. at 203:8-13; 1st Zeldenrust Decl.

19

20      [2] Portions of Mr. Curtis's 30(b)(6) deposition transcript are found in multiple additional
    record exhibits.  (*See* 1st Gahan Decl. ¶ 3, Ex. 3; 2d Gahan Decl. ¶ 25, Ex. 7.)  The court cites to
21  Mr. Curtis's deposition transcript as "Curtis Dep." wherever it appears in the record.

        [3] Unless otherwise stated, the court cites to the page numbers provided by the court's
22  electronic filing system.

ORDER - 3

1  ¶ 32, Ex. 31 at 16:13-20.)  CPS's determine an inmate's classification score by evaluating

2  five factors: (1) the seriousness of the current offense, (2) detainer status, (3) escape

3  history, (4) conviction history, and (5) incarceration experience.  (*Id.* ¶ 7, Ex. 6 at 9-10.)

4  CPS's also determine if an inmate has a Disciplinary History Risk Code ("DHRC"),

5  which identifies inmates with a history of violent, assaultive, or aggressive behavior

6  during past incarcerations.  (1st Zeldenrust Decl. ¶ 7, Ex. 6 at 9-10; Curtis 30(b)(6) Dep.

7  at 114:6-115:22.)  If the inmate has a DHRC, the inmate is placed in an isolation for a

8  more thorough classification review.  (*Id.*)

9      CPS's also determine an inmate's management risk score ("MR") by evaluating

10  the inmate's behavior history and current behavior at the time of booking.  An inmate's

11  MR is either 1, 2, or 5.  (1st Zeldenrust Decl. ¶ 7, Ex. 6 at 10; Curtis 30(b)(6) Dep. at

12  139:20-23, 142:2-143:17).)  Inmates with an MR of 1 or 2 are placed in King County

13  Jail's general population, in which there are one or more other inmates in their cells.  (1st

14  Zeldenrust Decl. ¶ 7, Ex. 6 at 10; Curtis 30(b)(6) Dep. at 139:20-23, 142:2-143:17.)

15  However, an inmate with an MR of 5 is placed in King County Jail's restrictive housing.

16  (Curtis 30(b)(6) Dep. at 144:10-23.)  Inmates in restrictive housing are housed by

17  themselves, and inmates in the general population may have a cell mate.  (1st Zeldenrust

18  Decl. ¶ 7, Ex. 6 at 10; Curtis 30(b)(6) Dep. at 139:20-23, 142:2-143:17.)  Inmates' MRs

19  change over time, and based on that change, an inmate may move from general

20  population to restrictive housing and vice-versa.  (Curtis 30(b)(6) Dep. at 144:16-23,

21  192:3-193:15.)  Within the general population, CPS's may determine that the inmate

22  should be in Close Custody, Medium Security, or Minimum Security.  (*Id.* at 83:6-11.)

1    An inmate in restrictive housing is classified as Maximum Security and may also be

2    classified as the even more restrictive Ultra Security.  (*Id.* at 78:19-80:15.)  Classification

3    staff review inmates every 30 days and may exercise their discretion to "override" the

4    classification upwards or downwards based on the inmate's behavior.  (*Id.* at

5    192:3-193:15.)

6            The parties dispute the role of outside medical records, including records

7    indicating an inmate's refusal to take medication, on Classification's MR and housing

8    determinations.  Defendants contend that CPS's do not consider an inmate's compliance

9    with prescribed medications, because that is monitored by JHS personnel and is not part

10   of the DAJD's scoring system.  (*See* Def. MPSJ at 7 (citing Curtis 30(b)(6) Dep. at

11   162:7-163:2, 248:1-251:20).)  Defendants further contend that once an inmate is cleared

12   from psychiatric housing, his or her mental health diagnosis is "not a factor" in the

13   classification determination.   (*Id.* (citing Curtis 30(b)(6) Dep. at 198:5-21).)

14           Plaintiffs contend that the evidence suggests that in practice CPSs attempt to

15   "know as much information about [inmates] as they can," and "have discretion to make

16   appropriate housing for the safety and security," regardless of the inmate's "score."

17   (Resp. to Def. MPSJ at 8 (citing 2nd Gahan Decl. (Dkt. # 77) ¶ 25, Ex. 12 ("Clark Dep."

18   at 77:9-18, 72:16-73:21; Ex. 7 at 99:25-100:19, 104:4-24 ("If we have reports of their

19   behavior, like at Western State [Hospital ("WSH")] . . . or another facility, we will use

20   that behavior in our assessment and our security for their housing . . . .").)

21   //

22   //

1    **B.    Mr. Meagher**

2        Mr. Meagher has spent much of his adult life institutionalized for his

3    schizo-affective disorder and other serious mental health issues.  (*See* 1st Gahan Decl.

4    ¶ 3, Ex. 14 at 000286.)  His mental health history includes over 300 outpatient contacts

5    with mental health providers, numerous civil commitments, and repeated findings of

6    mental incompetence by WSH.  (*See id.* at 000281.)

7        On August 23, 2017, Mr. Meagher was booked into King County Jail for the

8    twentieth time.  (1st Zeldenrust Decl. ¶ 2, Ex. 1 at 2-4.)  He was charged with second

9    degree assault for allegedly approaching two strangers near an AM/PM convenience store

10   in Burien, Washington, punching the man, and threatening the couple with a knife.  (*Id.*

11   ¶ 3, Ex. 2.)  Mr. Meagher was classified as requiring restrictive housing and had a DHRC

12   for assaulting a DAJD staff member in November 2016.  (*Id.* ¶ 2, Ex. 1 at 31.)  Mr.

13   Meagher was in Yellow psychiatric housing on August 23, 2017.  (*Id.* at 12.)  At a

14   Classification review on September 30, 2017, DAJD staff reduced Mr. Meagher's

15   security level to General Population—Close Security.  (*Id.* ¶ 9, Ex. 8.)

16       During his time at King County Jail, Mr. Meagher was transferred to WSH twice

17   for evaluations.  (1st Zeldenrust Decl. ¶ 10, Exs. 9a, 9b.)  Mr. Meagher stayed at WSH

18   from November 29, 2017, through February 27, 2018, and again from April 3, 2018,

19   through July 2, 2018.  (*Id.* ¶ 2, Ex. 1 at 7.)  Both evaluations concluded that Mr.

20   Meagher's mental health symptoms impaired his ability to rationally understand court

21   proceedings and assist his defense.  (1st Zeldenrust Decl. ¶ 10, Exs. 9a, 9b.)

22   *//*

1    On July 12, 2018, a psychiatrist visited Mr. Meagher's cell and noted that Mr.

2    Meagher continued to hear voices and suffer delusions.  (*See* 2d Gahan Decl. ¶ 25, Ex.

3    16.)  Nevertheless, Mr. Meagher remained in the general population and was not returned

4    to psychiatric housing.

5    **C.    Mr. Leae**

6        The parties do not dispute that Mr. Leae has a long history of committing violent,

7    unprovoked attacks.  Mr. Leae committed several of these attacks in the months leading

8    up to his altercation with Mr. Meagher.  On August 6, 2017, at Harborview Medical

9    Center ("HMC"), Mr. Leae, without provocation, repeatedly punched a mental health

10   professional and caused the professional to black out.  (1st Gahan Decl. ¶ 3, Ex. 1.)  As

11   Mr. Leae was being escorted away, he "punched the computer screen of a rolling

12   computer work station," destroying the screen with his fists.  (*Id.*)  A certificate for

13   determination of probable cause notes that "part of the reason Mr. Leae is [at HMC] is for

14   repeated unprovoked attacks on other people."  (*Id.*)

15       At booking in the jail, Mr. Leae was "uncooperative . . . and taken to restrictive

16   housing."  (Curtis 30(b)(6) Dep. at 254:8-255:2.)  By August 7, 2017, Mr. Leae was

17   classified by the jail as an inmate with a "special problem" for whom "[p]sychiatric

18   observation and psychiatric housing" were necessary.  (*Id.* at 256:4-14.)

19       On August 10, 2017, Mr. Leae had an MR of 5 and was in Ultra Security within

20   restrictive housing, meaning he was in a cell by himself.  (*Id.* at 257:11-258:5,

21   262:24-263:9.)  On August 24, 2017, JHS noted that it intended to move Mr. Leae to the

22   Maximum-Security cells on the 11th floor, but there was no space, so JHS moved him to

ORDER - 7

1    an "administrative segregation cell" where he was still isolated from other inmates. (*Id.*

2    at 262:15-263:9.) On September 14, 2017, JHS moved Mr. Leae to "Yellow" isolation,

3    where he still had no direct physical contact with other inmates. (2d Gahan Decl. ¶ 25,

4    Ex. 2 at 001386.) JHS staff explained that they had safety "concerns about placing him

5    in a group setting considering the recent assault on hospital staff at HMC." (*Id.*)

6        On September 20, 2017, King County Superior Court Judge James Halpert

7    ordered that Mr. Leae be evaluated at WSH. (1st Gahan Decl. ¶ 3, Ex. 10.) The transfer

8    to WSH did not occur until January 10, 2018. (*Id.*) Meanwhile, on October 2, 2017, JHS

9    transferred Mr. Leae out of the psychiatric unit. (Curtis 30(b)(6) Dep. at 268:5-17.) A

10   JHS record dated October 16, 2017, notes that "previous attempts at moving [Mr. Leae]

11   off the psychiatric unit have not lasted for more than a weeks [sic] time." (1st Gahan

12   Decl. ¶ 3, Ex. 4 at 001475.)

13       On October 28, 2017, Mr. Leae violently attacked another inmate, Jeremiah

14   Sullivan. Video evidence shows Mr. Leae, unprovoked, striking Mr. Sullivan, knocking

15   him to the floor. (1st Gahan Decl. ¶ 2.)[4] The video then shows Mr. Leae repeatedly

16   kicking Mr. Sullivan as Mr. Sullivan curls up and attempts to protect his head with his

17   arms. (*Id.*) The video then shows staff restraining Mr. Leae. (*Id.*) As a result of Mr.

18   Leae's attack, Mr. Sullivan sustained "multiple superficial injuries to his face and arm."

19   (1st Gahan Decl. ¶ 3, Ex. 5.) DAJD's incident report describes the attack as a "serious

20

21       [4] Mr. Gahan's declaration includes links to the security footage of this incident. (*See* 1st
     Gahan Decl. ¶ 2 (citing https://vimeo.com/420830368/d1d7eb92e2;

22   https://vimeo.com/420830446/54d3a8ce64 (last visited July 6, 2020)).) Defendants to not
     dispute the accuracy or authenticity of this video footage.

1   unprovoked assault." (*Id.*)  Following the attack, the DAJD Shift Commander

2   reclassified Mr. Leae as "Ultra Security," which required Mr. Leae to again be placed in

3   restrictive housing.  (*Id.* Exs. 5, 6.)

4          While in restrictive housing, on November 21, 2017, Mr. Leae threw his "sandal

5   out the pass-through, attempting to hit" an officer in his "groin area."  (*Id.* ¶ 3, Ex. 8.)  On

6   January 3, 2018, Mr. Leae was reclassified to administrative segregation for his

7   continuing "assaultive behavior."  (*Id.* ¶ 3, Ex. 9; Curtis 30(b)(6) Dep. at 326:14-327:1.)

8          Mr. Leae was transferred to WSH on January 10, 2018, for evaluation.  (1st Gahan

9   Decl. ¶ 3, Ex. 10.)  Mr. Leae made several violent attacks while at WSH.  On January 11,

10  2018, Mr. Leae "physically attacked a peer while they were both sitting down outside of

11  the TV rooms."  (*Id.* ¶ 3, Ex. 9 at 14.)  On January 14, 2018, Mr. Leae committed an

12  "[u]nprovoked assault" against another inmate and had to be secured in "5 point

13  restraints."  (*Id.* at 14.)  On January 26, 2018, "Mr. Leae assaulted a peer without

14  provocation" and then "attempted to 'stomp on him.'"  (*Id.* at 15.)  On February 8, 2018,

15  Mr. Leae suddenly "began hitting a peer with closed fists."  (*Id.*)

16         A February 14, 2018, WSH mental health evaluation report for Mr. Leae states

17  that he continues "to present with ongoing symptoms of psychosis."  (1st Gahan Decl.

18  ¶ 3, Ex. 10.)  The evaluation report notes that he was "paranoid" and committed an

19  "unprovoked assault on [a] peer today, and lists five instances in January and February

20  2018 in which Mr. Leae engaged in assaultive behavior toward others."  (*Id.*)  The

21  evaluation concludes that Mr. Leae was not competent to stand trial in the criminal case

22  against him for his attack on Mr. Sullivan.  (*Id.*)  WSH sent the evaluation report to King

County Jail on February 14, 2018, the day the report is dated.  (*Id.* at 44 (listing "King County Jail" as a facsimile recipient).)

On February 15, 2018, King County Superior Court "ordered that Mr. Troy Leae be admitted" to WSH for a "second competency restoration period and an evaluation regarding his competency." (*See* 1st Gahan Decl. ¶ 3, Ex. 11.)  A second evaluation from WSH dated April 25, 2018, found Mr. Leae competent to stand trial, notwithstanding his history of violent attacks and "very psychotic behavior." (*Id.*)  It noted that on April 18, 2018, Mr. Leae was "involved in a physical altercation with a peer" and on the following day, Mr. Leae "assaulted a staff member." (*Id.* at 003586.)  The evaluator found that Mr. Leae was at "high risk for future reoffending and dangerous behavior," a risk that would "further increase should he discontinue his medications." (*Id.* at 003595.)  However, the evaluation found Mr. Leae at the time to be "medications compliant." (*Id.* at 003592.) WSH faxed this evaluation to King County Jail on April 25, 2018. (*Id.* at 003576.)  A WSH transfer order, also dated April 25, 2018, states that Mr. Leae "has been assaultive towards staff and peers about once a week." (1st Gahan Decl. ¶ 3, Ex. 4 at 001814.)

Upon his return to King County Jail on April 25, 2018, JHS cleared Mr. Leae to go to non-psychiatric housing, but warned that his "[m]edication compliance is key to maintain a non-psychiatric housing placement." (*Id.* at 001807-8.)  Over the next several weeks, reports indicate that Mr. Leae frequently refused to take his medication. (*Id.* at 001807-08, 001812, 001816-17, 001820, 001849, 001874, 001849, 001859, 001940, 001956, 001969-70, 002004, 002022-23, 002048, 002056, 002060; *see also* Curtis 30(b)(6) Dep. at 342:5-25, 1st Gahan Decl. ¶ 3, Ex. 12 at 000139.)  Mr. Leae moved

1    between different housing units and restrictive levels at King County Jail, and continued

2    to have incidents.  During one incident, Mr. Leae tried to drown himself by sticking his

3    head in the cell toilet, conduct that resulted in a transfer to psychiatric "Red."  (*Id.* ¶ 3,

4    Ex. 4 at 001969.)

5         On June 1, 2018, Mr. Kilbourne discharged Mr. Leae from psychiatric housing.

6    (*Id.* ¶ 3, Ex. 9 at 000091 (stating "REL TO GP PER PES KILBOURNE").)  Mr.

7    Kilbourne's report states: "RN indicates medication compliance, and DAJD does not

8    express any concerns related to behaviors."  (1st Zeldenrust Decl. ¶ 16, Ex. 15.)  Mr.

9    Kilbourne was aware that Mr. Leae had a history of assaults and knew that Mr. Leae

10   attacked Mr. Sullivan in October 2017.  (*Id.* ¶ 30, Ex. 29 ("Kilbourne Dep.") at 65:4-22.)

11   Nevertheless, Mr. Kilbourne testified that his evaluation of Mr. Leae was limited to

12   assessing Mr. Leae's mental acuity, and not whether Mr. Leae would be safe around

13   other inmates.  (*Id.* at 63:17-64:2.)  Mr. Kilbourne found that Mr. Leae was "no longer

14   acutely mentally ill, and therefore, did not meet the criteria to remain in psychiatric

15   housing at the time."  (*Id.*)  Mr. Kilbourne noted on his report that Mr. Leae had recently

16   returned from an evaluation at WSH, but testified that he did not examine the WSH

17   evaluation.  (*Id.* at 114:2-18.)  Mr. Kilbourne testified that he had no influence over

18   whether his determination regarding psychiatric housing would affect Mr. Leae's security

19   status or whether Mr. Leae would be placed in a cell with another inmate.  (*Id.* at

20   85:21-25.)

21        Mr. Leae requested several times that his security status be lowered.  (*See* 1st

22   Gahan Decl. ¶ 3, Ex. 4 at 002009.)  Because of his "unpredictable behavior," King

County Jail staff initially declined to lower his security status.  (*See* Curtis 30(b)(6) Dep. at 344:11-23, 345:7-347:19.)  On June 13, 2018, after Mr. Leae had consistently refused to take his antipsychotic medication, a licensed mental health professional with JHS attempted to evaluate Mr. Leae, but Mr. Leae refused to engage with the evaluator.  (1st Gahan Decl. ¶ 3, Ex. 4 at 002064.)  "Consequently," the mental health professional wrote, "it was not possible to assess his mental status."  (*Id.*)  Mr. Leae continued refusing his medications thereafter and JHS noted that Mr. Leae was "unpredictable." (*Id.* at 002070, 002080.)

Mr. Curtis personally evaluated Mr. Leae on June 25, 2018, and conducted a "restrictive housing review."  (*See* 1st Gahan Decl. ¶ 3, Ex. 13.)  Mr. Curtis spent about "10 minutes" on the evaluation, which he conducted while standing outside of Mr. Leae's cell.  (*See* Curtis 30(b)(6) Dep. at 370:6-25.)  Mr. Curtis noted that Mr. Leae was "asking to return to general population" and "state[d] that [he] can be around other inmates and follow jail rules without any problems."  (1st Gahan Decl. ¶ 3, Ex. 13.)  Mr. Curtis wrote that Mr. Leae had "not had any infractions since 11/26/2017."  (*Id.*)  Mr. Curtis checked a box next to the text "Return to General Population" and noted that Mr. Leae "will be assigned to general population based on [his] improved behavior."  (*Id.*)  Mr. Curtis also lowered Mr. Leae's status from Maximum Security to Close Security.  (Curtis 30(b)(6) Dep. at 364:17-21.)

Mr. Curtis testified at his deposition that he did not ask Mr. Leae about whether he was taking his medications because that is "usually protected information" and it "would not be normal" for Mr. Curtis to ask about an inmate's medication.  (*See* Curtis 30(b)(6)

1    Dep. at 348:23-349:8.)  Moreover, Mr. Curtis testified that at the June 25, 2018,

2    evaluation, Mr. Leae had been out of psychiatric housing for about 30 days, so his

3    medication status "would not have been a concern" and was "nothing [Mr. Curtis] would

4    normally ask anyone."  (*Id.* at 350:7-22.)  Mr. Curtis testified that "Classification staff

5    has never had access to" inmates' WSH evaluation reports and he was therefore unaware

6    of Mr. Leae's unprovoked attacks while at WSH.  (*Id.* at 372:11-25.)  Further, Mr. Curtis

7    testified that Classification's restrictive housing review is "separate" from JHS's mental

8    health evaluations, that Classification evaluates inmates' behavior specifically, and that

9    Classification generally does not have access to inmates' mental health diagnoses.  (*Id.* at

10   373:20-374:7.)

11   **D.    Mr. Leae's Placement with Mr. Meagher and The Attack**

12          Mr. Meagher returned to King County Jail from WSH on July 2, 2018, after

13   obtaining a competency evaluation.  (1st Zeldenrust Decl. ¶ 32, Ex. 31 ("McCain Dep.")

14   at 63:17-21.)  A JHS nurse, Christopher Derrah, evaluated Mr. Meagher and determined

15   he was "okay for GP" on a Form 571, meaning he would be moved out of psychiatric

16   housing.  (1st Zeldenrust Decl. ¶ 18, Ex. 17.)  Mr. Derrah and a corrections officer gave

17   the Form 571 to CPS Theron McCain for a housing assignment.  (McCain Dep. at

18   64:20-65:3.)  The officer informed Mr. McCain that Mr. Meagher was returning from

19   WSH.  (*Id.* at 63:25-64:4.)

20   //

21   //

22   //

ORDER - 13

On the evening of July 8, 2018, at about 9:00 p.m., Classifications Program Specialist Rodney Prioleau received a call from correction officer Allen[5] about Mr. Leae. (1st Zeldenrust Decl. ¶ 33, Ex. 32 ("Prioleau Dep.") at 21:21-23:14.)  Mr. Allen stated that Mr. Leae may have been assaulted by his cellmate.  (*See id.*)  Mr. Prioleau reviewed Mr. Leae's prior housing assignments, checked to see if he had any "keep separate" orders from specific inmates, and reviewed Mr. Leae's PREA history to determine if he had previously been deemed a potential victim or abuser.  (*Id.* at 22:7-24.)  Mr. Prioleau then moved Mr. Leae to the Close Custody cell on the 8th floor that Mr. Meagher occupied.  (*Id.* at 21:21-23:14.)  Mr. Prioleau testified that he reviewed "all of Mr. Leae's files" including his "keep separate file" but did not examine Mr. Leae's most recent Western State Hospital evaluation because he did not receive any information from WSH, nor does Mr. Prioleau recall ever having received information about an inmate's conduct while that inmate was at WSH.  (*Id.* at 74:2-75:12, 77:3-11.)  Mr. Prioleau testified that he did not recall Mr. Leae's October 2017 incident with Mr. Sullivan at the time he decided to move Mr. Leae into Mr. Meagher's cell, despite the fact that it occurred inside King County Jail.  (*Id.* at 77:12-15.)

Mr. Leae continued to refuse his antipsychotic medications while in his cell with Mr. Meagher.  (*See, e.g.*, 1st Gahan Decl. ¶ 3, Ex. 4 at 002115.)  Keenan Pearson, an inmate and eyewitness, testified at his perpetuation deposition for the criminal case against Mr. Leae that once Mr. Leae and Mr. Meagher were in the same cell, Mr.

//

---

[5] The parties do not provide a first name for Mr. Allen.

1  Meagher "was looking worried . . . like he felt like he knew something was going to

2  happen."  (1st Gahan Decl. ¶ 3, Ex. 19 at 15:25-20:6.)  Of Mr. Leae, Mr. Pearson said in

3  the days before the altercation that "you could look at him and tell, like he's like a time

4  bomb.  He's about to explode pretty soon, and . . . nobody really want[ed] to go through

5  that . . . ."  (*Id.* at13:24-14:3.)  Mr. Meagher testified at his deposition that a few days in,

6  Mr. Leae began cussing at him and asking to fight.  (*See* 1st Zeldenrust Decl. ¶ 34, Ex. 33

7  ("Meagher Dep.") at 18:24-19:1.)  Mr. Meagher stated that he declined, and that he kited

8  for a cell change at some point prior to July 15, 2018.  (*Id.* at 15:11-16:3.)  Mr. Meagher

9  also testified that he pressed his in-cell intercom on several occasions before July 15,

10  2018, reporting to the corrections officer that he was having problems.  (*Id.* at 23:4-24.)

11  Mr. Meagher testified that the corrections officers told him to simply handle it himself.

12  (*Id.* at 21 ("I told [the officer] me and [Mr. Leae] are having problems.  I need some help

13  in here.  The officer said, [d]eal with it (or handle it).  I told him I can't handle it, we're

14  about to get in a fight.").)

15      On July 12, 2018, a JHS psychologist evaluated Mr. Meagher.  (1st Zeldenrust

16  Decl. ¶ 20, Ex. 19.)  Mr. Meagher told the psychologist about his difficulties with Mr.

17  Leae.  (*See* Meagher Dep. at 33:10-34:17.)  He reported to the psychologist that he was

18  "eating and sleeping OK."  (*See id.*)  Mr. Meagher also told the psychologist: "I get angry

19  sometimes very easily and I haven't been angry in years," although he reported that his

20  medication helps with his anger.  (*Id.*)

21      On the afternoon of July 15, 2018, Mr. Meagher pressed his intercom buzzer and

22  spoke with the deck officer, Defendant Joseph Garcia.  (1st Zeldenrust Decl. ¶ 21, Ex.

ORDER - 15

20.)  Mr. Meagher told Mr. Garcia that "he and his cell mate weren't getting along" and asked to be moved to a different cell.  (*Id.*)  Mr. Garcia contends that Mr. Meagher did not state that he was "being threatened or felt threatened in any way."  (*Id.*)  Mr. Garcia's notes indicate that another inmate, Michael Straightwell, was assigned to the cell to which Mr. Meagher requested to be moved.  (*Id.*)  Mr. Garcia testified that in his experience inmates frequently wanted to move to the cell Mr. Straightwell occupied because it had a view of the television.  (1st Zeldenrust Decl. ¶ 35, Ex. 34 ("Garcia Dep.") at 29:17-25.)  Mr. Garcia testified that he assumed that was why Meagher wanted to move.  (*Id.*)  Mr. Garcia's notes further state that he explained to Mr. Meagher that he was not able to move him to another cell at the time, but Mr. Meagher could ask him again later.  (1st Zeldenrust Decl. ¶ 21, Ex. 20.)  Mr. Garcia's notes about this interaction with Mr. Meagher were not included in his initial report dated July 15, 2018, but rather in a second report dated July 19, 2018.  (*Id.*)  In the second report, Mr. Garcia states that he "forgot to mention" this interaction in his July 15, 2018, report.  (*Id.*)

Within a few hours of Mr. Meagher's transfer request to Mr. Garcia, a fight broke out between Mr. Leae and Mr. Meagher inside their shared cell.  (*See, e.g.*, 1st Gahan Decl. ¶ 3, Ex. 23 at 12-16.)  The parties dispute how the fight started.  Defendants point to Mr. Meagher's trial testimony, which is what they describe as the "only evidence" of how the fight began:

> Q: Okay. I'm going to ask you to go back in time to tell us about July 15 . . . Did the defendant say anything memorable to you that day?
> A: I think he said – he said something about wanting to fight.
> Q: How did he say that? What words did he use?
> A: Just mumbled under a blanket.

Q: Okay. And when he said something about wanting to fight, what did you respond?

A: I responded with a – I go: This can go on right now, or something. We can start – we can get down and fight right now if you want to be so insistent on fighting.

Q: Okay. What happened next?

A: He was like mumbling again, and I said louder, 'We can fight right now.' And he jumped out of the seat and we got in a fight.

(*See* Def. MPSJ at 16 (quoting 1st Zeldenrust Decl. ¶ 23, Ex. 22 at 4-5).)  According to Defendants, Mr. Meagher "encouraged [Mr.] Leae to fight."  (*Id.*)

Corrections officers who witnessed the attack described it in the following ways in their reports:

- I looked into cell and saw Inmate Leae, Troy . . . kicking Inmate Meagher, Toby In the face and abdomen as he laid on the floor. . . . There was blood covering [Mr.] Meagher's face and uniform and a large amount of blood inside the cell on the floor near the entrance of the door.  [Mr.] Meagher appeared to be defenseless and barely conscious.  (1st Gahan Decl. ¶ 3, Ex. 23 at 31.)

- I observed Inmate Leae Troy stomping Inmate Meagher Toby viciously in the head and ribs.  Inmate Meagher appeared to be unconscious and there was blood pooling all over the floor.  (*Id.* at 30.)

- Inmate Meagher was in the fetal position near the door covered in blood being stomped on by Inmate Leae.  (*Id.* at 26.)

- Officers were giving Inmate Leae directives to stop punching and kicking Inmate Meagher.  Inmate Leae refused to comply and continued to punch and kick Inmate Meagher.  (*Id.* at 34.)

- I believed that Inmate Leae would have killed Inmate Meagher because of the viciousness of his attack on Inmate Meagher.  (*Id.* at 23.)

Mr. Leae ignored all orders to stop, and only stopped beating Mr. Leae once

//

//

ORDER - 17

officers ran into the cell and tasered Mr. Leae.  (*See id.* at 12-16.)  Photographs taken

immediately after the attack show Mr. Meagher, beaten and bloody, lying in pools of

blood on his cell floor.  (*Id.* at 43-54.)

After the beating, Defendants changed Mr. Leae's housing classification back to

Ultra Security and took him out of general population, where he was held in a single cell

for the remainder of his sentence.  (*See* 1st Gahan Decl. ¶ 3, Ex. 24.)

### III.   ANALYSIS

Mr. Meagher's and Defendants' cross-motions for partial summary judgment are

now before the court.  Defendants move for partial summary judgment on two primary

grounds.  First, Defendants contend that Mr. Kilbourne, Mr. Curtis, Mr. Prioleau, Mr.

Garcia, and Mr. Kintner are entitled to qualified immunity.  (*See* Def. MPSJ at 21-24.)[6]

Second, Defendants contend that they are further entitled to summary judgment on Mr.

Meagher's Section 1983 claims because Mr. Meagher was the proximate cause and/or a

superseding cause of his own injuries.  (*See id.* at 19.)[7]  Plaintiffs move for partial

summary judgment on several of Defendants' affirmative defenses.  The court sets forth

the applicable legal standards before analyzing each motion in turn.

---

[6] With the court's leave, Mr. Meagher amended his complaint to remove Mr. O'Farrell and Mr. McCain as Defendants.  (*See* 6/10/20 Order (Dkt. # 73) at 12; *see generally* TAC (Dkt. # 74).)

[7] Defendants also request partial summary judgment on Mr. Meagher's Section 1983 claim against King County on the basis that Mr. Meagher has not alleged a relevant custom or policy.  (*See* Def. MPSJ at 20.)  However, Mr. Meagher pleaded his Section 1983 claim against the individual defendants only, not against King County, and the court denied Mr. Meagher's motion for leave to add a Section 1983 claim against King County based on *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  (*See* 6/10/20 Order at 20.)  Accordingly, the court declines to address Defendants' argument regarding a claim that Mr. Meagher did not make.

**A.    Legal Standards**

1.  Summary Judgment Standard

Summary judgment is appropriate if the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).  A fact is "material" if it might affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "'genuine' only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party."  *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248-49).

The moving party bears the initial burden of showing there is no genuine dispute of material fact and that it is entitled to prevail as a matter of law.  *Celotex*, 477 U.S. at 323.  If the moving party does not bear the ultimate burden of persuasion at trial, it can show the absence of such a dispute in two ways:  (1) by producing evidence negating an essential element of the nonmoving party's case, or (2) by showing that the nonmoving party lacks evidence of an essential element of its claim or defense.  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000).  If the moving party meets its burden of production, the burden then shifts to the nonmoving party to identify specific facts from which a factfinder could reasonably find in the nonmoving party's favor.  *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

If the moving party bears the ultimate burden of persuasion at trial, it must establish a *prima facie* showing in support of its position on that issue.  *UA Local 343 v.*

1   *Nor-Cal Plumbing, Inc.*, 48 F.3d 1465, 1471 (9th Cir. 1994).  That is, the moving party

2   must present evidence that, if uncontroverted at trial, would entitle it to prevail on that

3   issue.  *Id.* at 1473.  If the moving party meets its burden of production, the burden then

4   shifts to the nonmoving party to identify specific facts from which a fact finder could

5   reasonably find in the nonmoving party's favor.  *Celotex*, 477 U.S. at 324; *Anderson*, 477

6   U.S. at 250.

7         2.  <u>Fourteenth Amendment—Failure to Protect</u>

8         A state official's liability under 42 U.S.C. § 1983 is predicated on his "integral

9   participation" in an alleged constitutional violation.  *Blankenhorn v. Cty of Orange*, 485

10  F.3d 463,  481 n.12 (9th Cir. 2007) (quoting *Chuman v. Wright*, 76 F.3d 292, 294-95 (9th

11  Cir. 1996)).  "[I]ntegral participation does not require that each officer's actions

12  themselves rise to the level of a constitutional violation."  *Boyd v. Benton Cty.*, 374 F.3d

13  773, 780 (9th Cir. 2004).  "But it does require some fundamental involvement in the

14  conduct that allegedly caused the violation."  *Blankenhorn*, 485 F.3d at 481 n.12 (citing

15  *Boyd*, 374 F.3d at 780).

16        Claims alleging that prison officials failed to protect a pretrial detainee from

17  violence are analyzed under the Fourteenth Amendment's Due Process Clause.  *See*

18  *Castro v. Cty. of Los Angeles*, 833 F.3d 1071 (9th Cir. 2016).  A pretrial detainee

19  establishes a Fourteenth Amendment failure-to-protect claim "if he or she can show that:

20  (1) [the] defendant made an intentional decision with respect to the conditions of [the]

21  plaintiff's confinement; (2) [the] plaintiff was exposed to a 'substantial risk of serious

22  harm . . . that could have been eliminated through reasonable and available measures'; (3)

1    '[the] defendant did not take reasonable available measures to abate that risk, even

2    though a reasonable officer in the circumstances would have appreciated the high degree

3    of risk involved—making the consequences of the defendant's conduct obvious;' and (4)

4    by not taking those measures, [the] defendant caused [the] plaintiff's injuries." *Townsel*

5    *v. Madera Cty. Dep't of Corr.*, No. 115CV00652BAMPC, 2017 WL 6371315, at *2

6    (E.D. Cal. Dec. 13, 2017) (quoting *Castro*, 833 F.3d at 1071). "With respect to the third

7    element, the defendant's conduct must be objectively unreasonable, a test that will

8    necessarily turn on the facts and circumstances of each particular case." *Castro*, 833 F.3d

9    at 1071. Regarding the scope of the risk at issue, "[i]t does not matter whether the risk

10    came from a particular source or whether a prisoner faced the risk for reasons personal to

11    him or because all prisoners in his situation faced the risk." *Farmer v. Brennan*, 511 U.S.

12    825, 826 (1994).

13          "To establish a failure to protect under the Fourteenth Amendment, as opposed to

14    the Eighth Amendment, a plaintiff need not prove that the defendant was subjectively or

15    actually aware of the level of risk." *Castro*, 833 F.3d at 1071. The plaintiff need only

16    show that a "reasonable officer in the circumstances would have appreciated the high

17    degree of risk involved and that the officer['s] failure to take reasonable measures to

18    protect [the plaintiff] caused his injuries." *Id.* at 1072. A plaintiff "who asserts a due

19    process claim for failure to protect [must] prove more than negligence but [something]

20    less than subjective intent—something akin to reckless disregard." *Id.*

21    //

22    //

1          3.  Qualified Immunity

2          In determining whether a government employee is entitled to qualified immunity,

3   the court must decide:  (1) whether the facts that the plaintiff alleges assert a violation of

4   a constitutional right; and (2) whether the right at issue was "clearly established" at the

5   time the defendant engaged in the misconduct.  *Pearson v. Callahan*, 555 U.S. 223, 232

6   (2009) (discussing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  Courts may consider the

7   two prongs of the qualified immunity analysis in any order.  *See Chism v. Washington*,

8   661 F.3d 380, 386 (9th Cir. 2011).

9          To determine whether a right was clearly established, "the standard is one of fair

10  warning:  where the contours of the right have been defined with sufficient specificity

11  that a state official had fair warning that [his] conduct deprived a victim of his rights, [he]

12  is not entitled to qualified immunity."  *Serrano v. Francis*, 345 F.3d 1071, 1077 (9th Cir.

13  2003) (quotation marks and citation omitted).  "The contours of the right must be

14  sufficiently clear that a reasonable official would understand that what he is doing

15  violates that right."  *See id.*  "This is not to say that an official action is protected by

16  qualified immunity unless the very action in question has previously been held unlawful;

17  but it is to say that in light of pre-existing law the unlawfulness must be apparent."

18  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (internal citations omitted).  There does

19  not need to be a case directly on point, but "existing precedent must have placed the

20  statutory or constitutional question beyond debate."  *Ashcroft v. al-Kidd*, 563 U.S. 731,

21  741 (2011); *see also Hope v. Pelzer*, 536 U.S. 730, 739-41 (2002) ("Officials can still be

22

1   on notice that their conduct violates established law even in novel factual

2   circumstances.").

3   **B.   Defendants' Motion**

4        1.   Qualified Immunity

5        The individual Defendants contend that they are entitled to qualified immunity on

6   Mr. Meagher's Section 1983 claim because there is no clearly established Ninth Circuit

7   law "stating that a [j]ail's medical or correctional staff violates a pre-trial detainee's

8   constitutional rights by not considering [inmates' history of violence] when providing the

9   inmate medical care, when classifying the inmate, or determining an inmate's housing."

10  (Def. MPSJ at 22.)  In response, Mr. Meagher cites case law he argues constitutes clearly

11  established law.  (*See* Resp. to Def. MPSJ at 13-15 (citing *Wilk v. Neven*, 956 F.3d 1143

12  (9th Cir. 2020); *Lemire v. Calif. Dep't of Corrs. and Rehab.*, 726 F.3d 1062, 1068 (9th

13  Cir. 2013); *Cortez v. Skol*, 776 F.3d 1046 (9th Cir. 2015); *Castro*, 833 F.3d 1060.

14       The right to be "free from violence at the hands of other inmates" is clearly

15  established.  *See Castro*, 833 F.3d at 1067.  Defendants' narrow framing of the right at

16  stake is unavailing.  *See id.* ("The Supreme Court need not catalogue every way in which

17  one inmate can harm another for us to conclude that a reasonable official would

18  understand that his actions violated Castro's right."); *see also Carrasquilla v. Cty. of

19  Tulare*, No. 1:15-CV-00740-BAM, 2016 WL 7475702, at *6 (E.D. Cal. Dec. 27, 2016)

20  (discussing *Castro* and concluding that the "contours" of the plaintiff inmate's right

21  "involved the right to be free violence at the hands of other inmates").  Further, it is

22  clearly established that prison officials must "take reasonable measures to mitigate the

1  [known] substantial risk[s]" to a prisoner.  *Wilk*, 956 F.3d at 1150 (quoting *Castro*, 833

2  F.3d at 1067.

3      Having concluded that Mr. Meagher's right to be protected from violence from

4  other inmates is clearly established, the only question remaining with respect to qualified

5  immunity is whether the individual Defendants violated Mr. Meagher's clearly

6  established right.  *See Pearson*, 555 U.S. at 232.  The court analyzes this question on a

7  defendant-by-defendant basis.

8          a.  *Mr. Kilbourne*

9      Mr. Meagher contends that Mr. Kilbourne violated his constitutional rights

10  because he "released Mr. Leae from the Psychiatric Unit when it should have been clear

11  that Mr. Leae posed a risk to anyone outside of that unit."  (Pl. Resp. to Def. MPSJ at

12  16-17.)  The court concludes that Mr. Kilbourne is entitled to qualified immunity because

13  even viewing the facts in the light most favorable to Mr. Meagher, Mr. Kilbourne did not

14  violate Mr. Meagher's 14th Amendment rights.  Mr. Kilbourne testified that his role was

15  limited to reviewing Mr. Leae's mental acuity, and Mr. Kilbourne did not have the

16  authority to alter Mr. Leae's security level or to place him in a cell with another inmate.

17  (*See* Kilbourne Dep. at 63:17-64:2; 85:21-25.)  Mr. Meagher presents no evidence that

18  contradicts Mr. Kilbourne's testimony on this point.  (*See generally* Pl. Resp. to Def.

19  MPSJ.)

20      Given these facts, no reasonable jury could find that Mr. Kilbourne's actions

21  satisfy either the first or second element of *Castro*'s four-part test for pretrial detainee

22  failure to protect claims.  Mr. Kilbourne did not make "an intentional decision with

1   respect to the conditions of [the] plaintiff's confinement," because moving Mr. Leae out

2   of psychiatric housing was not a decision that affected Mr. Meagher's conditions of

3   confinement.  *See Castro*, 833 F.3d at 1071.  Moreover, Mr. Kilbourne's decisions did

4   not expose Mr. Meagher to a "substantial risk of serious harm."  *Id.*

5           In sum, no reasonable jury could find that Mr. Kilbourne acted with reckless

6   disregard for Mr. Meagher's safety.  Therefore, Mr. Kilbourne is entitled to qualified

7   immunity on Mr. Meagher's Section 1983 claim, and the court GRANTS Defendants'

8   motion for partial summary judgment with respect to that issue.

9           *b.  Mr. Curtis*

10          Mr. Meagher asserts that Mr. Curtis "went against Classifications' own policies

11  when he ignored warnings from WSH and failed to review Mr. Leae's behavior during

12  the previous six months before determining that he was compliant and a safe candidate

13  for General Population."  (Pl. Resp. to Def. MPSJ at 17.)  Defendants contend that Mr.

14  Curtis, like all Classification staff, do not have access to WSH records or JHS mental

15  health evaluations.  (*See* Curtis Dep. at 372:11-25.)  Mr. Meagher responds that

16  "Defendants' own policies make clear that no such protection applies to Mr. Leae's WSH

17  evaluations (which were provided to the jail on the same day that they were completed),

18  nor does it apply to JHS records, including those related to an inmate's behavior or

19  medication status."  (Pl. MPSJ at 8 n.1 (citing 1st Gahan Decl. ¶ 3, Ex. 15).)

20          Although Defendants deny that a patient's medication history is generally shared

21  between JHS and DAJD, Mr. Curtis testified that "the input from psych staff about [an

22  inmate] taking medication" is "a factor" in determining whether to place an inmate in

1    general population.  (Curtis 30(b)(6) Dep. at 272:6-13.)  Moreover, although Defendants

2    contend that Classification does not have access to WSH records, Mr. Curtis testified that

3    Classification does evaluate such records when they have access to them.  (*See id.* at

4    104:4-24 ("If we have reports of their behavior, like at [WSH], for example, or another

5    facility, we will use that behavior in our assessment and our security for their housing

6    while they're with us. . . . I've seen cases where information from . . . [WSH], or another

7    hospital reported to us affected the inmate's score and their housing.").)  Further, a King

8    County policy states that inmates "presenting an ongoing physical risk to others are

9    designated for a single cell separation from all other inmates." (*See* 2d Gahan Decl. ¶ 25,

10   Ex. 10.)  The same policy provides that inmates "are given an individual housing

11   assignment placement [and] onto Administrative Segregation whose continued presence

12   in general population pose[s] a serious threat to life, property, self, staff or other inmate's

13   safety." (*Id.*)  Another policy states that protected health information may be disclosed in

14   limited circumstances to DAJD, "where the limited disclosure is required in order

15   to . . . [e]nsure the health and safety of the inmate or other inmates." (*See* 1st Gahan

16   Decl. ¶ 3, Ex. 15.)

17          A reasonable juror could find that Mr. Curtis satisfies the first two parts of the

18   *Castro* test because he made an intentional decision that posed a substantial risk of

19   serious harm to Mr. Meagher—and all other inmates in King County Jail's general

20   population—by lowering Mr. Leae's security classification and authorizing him to be

21   placed in the general population with other inmates. *See Farmer*, 511 U.S. at 826 ("It

22   does not matter whether the risk came from a particular source or whether a prisoner

1    faced the risk for reasons personal to him or because all prisoners in his situation faced

2    the risk.").  Mr. Leae's particularly violent recent history indicates a serious risk of

3    placing him in close proximity to other inmates.  In the months leading up to his Mr.

4    Curtis's review of Mr. Leae, Mr. Leae had consistently committed numerous assaults and

5    violently beaten another inmate in King County Jail.  *See Cavness v. Winch*, No.

6    14-CV-03403-EDL, 2018 WL 7247143, at *8-9 (N.D. Cal. Dec. 18, 2018) (denying

7    summary judgment to the defendants in part because placing the plaintiff inmate with "a

8    particularly dangerous inmate" who "had attacked a jail deputy" put the plaintiff at a

9    substantial risk of serious harm).

10          With respect to the third part of the *Castro* test, a reasonable jury could find that

11   Mr. Curtis acted with reckless disregard by authorizing Mr. Leae to be placed in the

12   general population given his recent history of serious violence.  Mr. Curtis spent only

13   about ten minutes on his evaluation of Mr. Leae before reducing his classification from

14   Maximum Security to Close Security.  (*See* Curtis Dep. at 370:6-25.)  Mr. Curtis wrote in

15   his report that Mr. Leae had "not had any infractions since 11/26/2017," despite the fact

16   that Mr. Leae spent most of the time since that date not in King County Jail but at WSH,

17   where he committed several violent, unprovoked assaults.  (*See* 1st Gahan Decl. ¶ 3, Ex.

18   13.)  Mr. Curtis contends that he did not have access to WSH records, but his own

19   testimony and King County's written policies cast sufficient doubt on his assertion to

20   raise a genuine dispute of material fact on that issue.  Finally, a reasonable jury could find

21   that Mr. Curtis was a cause of Mr. Meagher's injuries; but for placing Mr. Leae in the

22   general population, he would not have had the opportunity to attack Mr. Meagher.  *See*

1   *Lemire*, 726 F.3d at 1080-81 ("As a practical matter, plaintiffs who have already

2   demonstrated a triable issue of fact as to whether prison officials exposed them to a

3   substantial risk of harm, and who actually suffered precisely the type of harm that was

4   foreseen, will also typically be able to demonstrate a triable issue of fact as to

5   causation.").

6       Because there are triable issues of fact as to whether Mr. Curtis's conduct violated

7   Mr. Meagher's constitutional right, the court finds that Mr. Curtis is not entitled to

8   qualified immunity on Mr. Meagher's failure-to-protect claims and DENIES Defendants'

9   motion with respect to that issue.

10          c.  *Mr. Prioleau*

11      Mr. Prioleau is the CPS who moved Mr. Leae directly into Mr. Meagher's cell.

12  Mr. Meagher asserts that Mr. Prioleau is culpable for transferring Mr. Leae "into the cell

13  occupied by Mr. Meagher without looking into Mr. Leae's violent history or compliance

14  with antipsychotic medications, investigating the assault reported by Mr. Leae, or

15  reviewing Mr. Meagher's mental health history."  (*See* Pl. Resp. to Def. MPSJ at 11

16  (citing 2d Gahan Decl. ¶ 25, Ex. 14 ("Prioleau Dep.") at 72:3-24, 73:18-75:12,

17  75:24-79:15).)  Mr. Meagher contends that Mr. Prioleau had all of the evidence of Mr.

18  Leae's violent behavior at his disposal but did not review it.  (*See id.* at 17.)  Mr.

19  Meagher further contends that this information, along with the fact that Mr. Prioleau was

20  aware that Mr. Leae was involved in an altercation on July 8, 2018, "should have

21  prevented the transfer into Mr. Meagher's cell, and provided Classifications with an

22  //

1    opportunity to remedy Mr. Curtis' initial erroneous decision lowering Mr. Leae's security

2    level." (*See id.*)

3          Defendants contend that Mr. Prioleau is entitled to qualified immunity because his

4    only involvement was that "[a]fter learning that [Mr.] Leae may have been a victim of

5    assault, he simply moved [Mr.] Leae to another Close Custody Cell – [Mr.] Meagher's

6    cell." (*See* Def. MPSJ at 23.)  However, Defendants do not point to facts to refute Mr.

7    Meagher's contention that Mr. Prioleau had access to and could have reviewed Mr.

8    Leae's history of altercations and/or alerted Classification before moving him into Mr.

9    Meagher's cell.  (*See generally id.*)

10         As the officer who directly placed Mr. Leae in the cell with Mr. Meagher, a

11   reasonable jury could find that Mr. Prioleau satisfies the first two parts of the *Castro* test

12   because he made an intentional decision that put Mr. Meagher at a substantial risk of

13   serious harm.  *See Castro*, 833 F.3d at 1071.  Moreover, like with Mr. Curtis, there are

14   triable issues of fact regarding the information to which Mr. Prioleau had access, and

15   there is sufficient evidence from which a jury could conclude that Mr. Prioleau acted with

16   reckless disregard by placing Mr. Leae into Mr. Meagher's cell after Mr. Leae was

17   involved in yet another altercation on July 8, 2018.  Finally, a reasonable jury could find

18   that placing Mr. Leae in Mr. Meagher's cell was a cause of Mr. Meagher's injuries.

19         Because there are triable issues of fact as to whether Mr. Prioleau's conduct

20   violated Mr. Meagher's constitutional right, the court finds that Mr. Prioleau is not

21   entitled to qualified immunity on Mr. Meagher's failure-to-protect claim and DENIES

22   Defendants' motion with respect to that issue.

1          *d.  Mr. Garcia*

2          Triable issues of fact preclude summary judgment in favor of Mr. Garcia on

3   qualified immunity grounds.  Mr. Garcia did not intervene or contact Classification when

4   Mr. Meagher requested a transfer to another cell just hours before the altercation.  (*See*

5   1st Zeldenrust Decl. ¶ 21, Ex. 20); *see also Clem v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir.

6   2009) (holding that the plaintiff was entitled to a failure-to-protect jury instruction in part

7   because "[t]here was evidence showing that [the defendant officer] heard [the plaintiff

8   inmate's] call for help immediately prior to his beating, and that the officer took no steps

9   to abate any risk to [the plaintiff]").

10          Mr. Garcia claims that Mr. Meagher did not state that he was "being threatened

11  or felt threatened in any way."  (1st Zeldenrust Decl. ¶ 21, Ex. 20.)  However, substantial

12  evidence in the record calls Mr. Garcia's contention into question.  Mr. Garcia admits

13  that Mr. Meagher told him that "he and his cell mate weren't getting along."  (*Id.*)  That

14  admission tracks Mr. Meagher's testimony that he pressed his in-cell intercom on several

15  occasions before July 15, 2018, reporting to the corrections officer that he was having

16  problems with Mr. Leae.  (Meagher Dep. at 23:4-24.)  Keenan Pearson, an inmate and

17  eyewitness, testified at his perpetuation deposition for the criminal case against Mr. Leae

18  that once Mr. Leae and Mr. Meagher were in the same cell, Mr. Meagher "was looking

19  worried like . . . like he felt like he knew something was going to happen."  (1st Gahan

20  Decl. ¶ 3, Ex. 19 at 15:25-20:6.)

21          Moreover, a reasonable jury might question Mr. Garcia's credibility.  Mr. Garcia's

22  initial report did not disclose that Mr. Meagher requested a transfer at all, and Mr. Garcia

1    only disclosed the transfer request in an amendment to his report four days later. (1st

2    Zeldenrust Decl. ¶ 21, Ex. 20.)  Moreover, Mr. Garcia did not contact Classification

3    about Mr. Meagher.  (2d Gahan Decl. ¶ 25, Ex. 23 at 2.)  Mr. Curtis, King County's Rule

4    30(b)(6) designee, admitted that Mr. Garcia "should have at least notified Classification

5    that he's – that there's some kind of conflict between the two of them."  (Curtis 30(b)(6)

6    Dep. at 95:13-96:9.)

7            Viewed in the light most favorable to Mr. Meagher, Mr. Garcia's failure to

8    intervene upon Mr. Meagher's transfer request or to contact Classification was an

9    intentional decision that placed Mr. Meagher at a substantial risk of serious harm.  *See*

10   *Castro*, 833 F.3d at 1071.  A reasonable jury could find that Mr. Garcia acted with

11   reckless disregard by failing to act under the circumstances.  *Id.*  Finally, a reasonable

12   jury could conclude that Mr. Garcia's failure to act was a cause of Mr. Meagher's

13   injuries.  *Id.*

14          Because there are triable issues of fact as to whether Mr. Garcia's conduct violated

15   Mr. Meagher's constitutional right, the court finds that Mr. Garcia is not entitled to

16   qualified immunity on Mr. Meagher's failure-to-protect claim and DENIES Defendants'

17   motion with respect to that issue.

18              *e.  Mr. Kintner*

19          Defendants contend that Mr. Kintner is entitled to qualified immunity because

20   "there is no evidence that [Mr. Kintner] had any involvement [in] the classification

21   decisions in this case."  (*See* Def. MPSJ at 21.)  Plaintiffs contend that Mr. Kintner

22   //

1  "supervised the decisions" of both Mr. Curtis and Mr. Prioleau that led to housing Mr.

2  Leae and Mr. Meagher in the same cell.  (*See* Pl. Resp. to Def. MPSJ at 19.)

3      A defendant may be held liable as a supervisor under 42 USC § 1983 "if there

4  exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a

5  sufficient causal connection between the supervisor's wrongful conduct and the

6  constitutional violation."  *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011).

7      Although Mr. Meagher points to portions of Mr. Kintner's deposition in which he

8  discusses King County policies and processes, Mr. Meagher fails to point to any evidence

9  regarding any personal involvement or other wrongful conduct on behalf of Mr. Kintner

10  with respect to the decisions that ultimately placed Mr. Leae in a cell with Mr. Meagher.

11  Accordingly, Mr. Kintner is entitled to qualified immunity, and the court GRANTS

12  Defendants' motion on that issue.

13      2.  Proximate Cause

14      Defendants contend that they are further entitled to summary judgment on Mr.

15  Meagher's Section 1983 claims because Mr. Meagher was the proximate cause and/or a

16  superseding cause of his own injuries.  (*See* Def. MPSJ at 19.)  Specifically, Defendants

17  point to Mr. Meagher's trial testimony to support their argument that the fight would not

18  have occurred absent Mr. Meagher's "encouragement" of it.  (*See id.* at 20.)  Mr.

19  Meagher responds that comparative fault is not a defense to a Section 1983 claim.  (*See*

20  Resp. to Def. MPSJ at 22.)  Moreover, Mr. Meagher argues that even if comparative fault

21  was a defense to a Section 1983 claim, that Defendants are not entitled to summary

22  judgment because proximate cause is an issue of fact here.  (*See id.* at 23.)  In reply,

1    Defendants argue that Mr. Meagher confuses the concepts of proximate cause and

2    contributory fault and cite cases for the proposition that where an inmate voluntarily

3    encounters the risk of harm, his or her conduct is a superseding cause of his or her

4    injuries and absolves defendant government officers of liability.  (*See* Def. MPSJ Reply

5    (Dkt. # 83) at 3 (citing *Wilson v. Archer*, No. 2:12-CV-01082-MO, 2014 WL 37788, at

6    *3 (D. Or. 2014); *Garces v. Degadeo*, No. 1:06-CV-1038-JAT, 2010 WL 796831, at *4

7    (E.D. Cal. 2010).)

8           Despite the parties' confusion regarding which principle applies, Defendants are

9    not entitled to summary judgment on the basis of Mr. Meagher's actions because there is

10   at the least there a genuine dispute of material fact regarding whether Mr. Meagher or

11   Mr. Leae initially caused the fight that injured Mr. Meagher.  Defendants rely solely on

12   Mr. Meagher's prior trial testimony, but even that testimony suggests that Mr. Meagher

13   reacted to Mr. Leae initially telling Mr. Meagher that he wanted to fight.  (*See* 1st

14   Zeldenrust Decl. ¶ 23, Ex. 22 at 4-5.)  Moreover, none of the officer reports documenting

15   the fight indicate that Mr. Meagher struck Mr. Leae.  (*See* 1st Gahan Decl. ¶ 3, Ex. 23 at

16   31.)  Further, King County's Rule 30(b)(6) designee Grady Connor testified that based on

17   his investigation there was no reason to believe the fight was mutual, and that he believes

18   Mr. Meagher "was the victim of an assault" by Mr. Leae.  (*See* 1st Gahan Decl. ¶ 3, Ex.

19   26 ("Connor 30(b)(6) Dep.") at 67:8-11, 97:18-24.)  Accordingly, Defendants are not

20   entitled to summary judgment on the basis that Mr. Meagher proximately caused his own

21   injuries or that Mr. Meagher was a superseding cause of his own injuries.

22   *//*

1 **C.     Plaintiffs' Motion**

2          Plaintiffs move for partial summary judgment on several of Defendants'

3  affirmative defenses.  The court GRANTS Mr. Meagher's motion for the reasons set

4  forth below.

5          1.   Contributory Fault: Section 1983 and Breach of Contract

6          Defendants include the following affirmative defense in their second amended

7  complaint:  "Plaintiff's injuries and damages, if any, were proximately caused by the

8  negligence and/or fault of the plaintiff."  (*See* Ans. to SAC (Dkt. # 23) at 8.)

9  Comparative fault is not a defense to a Section 1983 claim.  *See, e.g.*, *Miller v. Schmitz*,

10  No. 1:12-cv-0137 LJO SAB, 2013 WL 5754945, at *5 (E.D. Cal. 2013).  Moreover,

11  contributory fault is not a defense to a breach of contract claim.  *See, e.g.*, *Cypress Ins.*

12  *Co. v. SK Hynix Am., Inc.*, No. 2:17-CV-00467-RAJ, 2019 WL 625509, at *2 (W.D.

13  Wash. 2019).  Accordingly, the court GRANTS Mr. Meagher's motion with respect to

14  Defendants' contributory fault defense as it pertains to Mr. Meagher's Section 1983 and

15  breach of contract claims.

16          2.   Contributory Fault: Negligence

17          Plaintiffs also contend that Defendants' contributory fault defense fails as a matter

18  of public policy with respect to Plaintiffs' negligence claim because Defendants' duty to

19  inmates is non-delegable.  (*See* Pl. MPSJ at 16-19.)  *Gregoire v. City of Oak Harbor*, 244

20  P.3d 924 (Wash. 2010), disposes of this issue.  In *Gregoire*, the Washington Supreme

21  Court recognized that "jailers have a special relationship with inmates, creating an

22  affirmative duty to provide for inmate health, welfare, and safety."

*Gregoire*, 244 P.3d at 929.  The Court held that "[t]he jail's duty to protect inmates includes protection from self-inflicted harm and, in that light, contributory negligence has no place in such a scheme." *Id.* at 931.  Accordingly, the court GRANTS Mr. Meagher's motion with respect to Defendants' comparative fault defense against Mr. Meagher's negligence claim.

> 3.   <u>Mitigation</u>

Plaintiffs contend that they are entitled to summary judgment on Defendants' mitigation defense on the ground that Defendants have not disclosed an expert mitigation witness.  (*See* Pl. MPSJ at 16.)  Defendants do not contest that they failed to disclose an expert mitigation witness, but contend that their mitigation defense has merit because "[t]here is evidence from which a fact finder could conclude that [Mr. Meagher's attorney Geraldine] McNamara aggravated Meagher's emotional distress by showing him pictures of his injuries."  (*See* Def. Resp. to Pl. MPSJ at 4-5.)  Defendants cite one piece of record evidence in support:  a note from an assistant director at NAVOS stating that Ms. McNamara:

> has been showing Toby pictures of his head wound when it was fresh –
> something she used to do a year ago or so when I confronted her about it. I
> told her that I had been told she was showing Toby these pictures again, and
> that this is something we have talked about and it is BAD for Toby, he clearly
> has a reaction when she shows him which she ignores – almost as if she is
> trying to re-traumatize him or punish him.

(1st Zeldenrust Decl. ¶ 25, Ex. 24 at 55.)  Ms. McNamara was questioned about showing Mr. Meagher these photographs at her deposition, and testified that showing Mr. Meagher photographs of real events was one technique she used to ground him in reality

1   when he began to lose his grip and say things like "jail is fun," "you get to play baseball

2   in jail." (3rd Gahan Decl. (Dkt. # 82) ¶ 4, Ex. 2 ("McNamara Dep.") at 84:13-87:15.)

3   Mr. Meagher contends that this testimony alone is insufficient to create a genuine dispute

4   of material fact that Mr. Meagher failed to mitigate his damages.

5        The court agrees with Mr. Meagher and GRANTS Mr. Meagher's motion for

6   partial summary judgment with respect to Defendants' mitigation defense. Even

7   assuming that showing the photographs to Mr. Meagher made his condition worse,

8   Defendants fail to explain how a third party—Ms. McNamara—showing those

9   photographs is sufficient to meet their burden to prove that *Mr. Meagher* failed to

10  mitigate his damages. *See Model Civ. Jury Instr.* 9th Cir. 5.3 (2019). Moreover,

11  Defendants do not create a genuine dispute of material fact regarding the amount by

12  which Mr. Meagher failed to mitigate his damages, a necessary element of a mitigation

13  defense. (*See id.*; *see generally* Def. Resp. to Pl. MPSJ.)

14        4.   Apportionment of Liability and Segregation of Damages

15        Mr. Meagher argues that Defendants cannot apportion liability or damages to Mr.

16  Leae. (*See* Pl. MPSJ at 19-24; Answer to SAC at 8.) Defendants appear to concede that

17  they cannot apportion fault to Mr. Leae but argue that Mr. Meagher misses the point

18  because Mr. Meagher fails to address apportionment of liability to Mr. Meagher. (*See*

19  Def. Resp. to Pl. MPSJ at 3 n.5.) However, Defendants' affirmative defense specifically

20  states that "Troy Leae may be at fault for some or all of [Mr. Meagher's] claimed injuries

21  and damages." (*See* Answer to SAC at 8.) Accordingly, the court considers Mr.

22

ORDER - 36

1    Meagher's motion with respect to apportionment of liability and damages to Mr. Leae to

2    be uncontested and GRANTS the motion.

3                               **IV.    CONCLUSION**

4            The court GRANTS Mr. Meagher's motion for partial summary judgment (Dkt.

5    # 62); and GRANTS in part and DENIES in part Defendants' motion for partial summary

6    judgment (Dkt. # 64) as set forth in this order.

7            Dated this 9th day of July, 2020.

8

9

10                                              JAMES L. ROBART
                                                United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

ORDER - 37